## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 10 2018, 11:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re: the Termination of the Parent-Child Relationship of C.S.; <br><br> T.S. (Father), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | October 10, 2018 <br><br> Court of Appeals Case No. 18A-JT-1113 <br><br> Appeal from the Fayette Circuit Court <br><br> The Honorable Hubert Branstetter, Judge <br><br> Trial Court Cause No. 21C01-1701-JT-36 |

**Pyle, Judge.**

# Statement of the Case

T.S. ("Father") appeals the termination of the parent-child relationship with his daughter, C.S. ("C.S."), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in C.S.'s removal or the reasons for placement outside Father's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the C.S.'s well-being; and (3) termination of the parent-child relationship is in C.S.'s best interests. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

We affirm.

# Issue

Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

The evidence and reasonable inferences that support the judgment reveal that Mother and Father (collectively, "Parents") were married in 2005, and have

---

[1] C.S.'s mother ("Mother") is not a party to this appeal.

three children who were born in approximately 2005, 2007, and 2009.[2]  In 2009, when Mother and Father lived in Tennessee, Father faced a burglary charge involving a church and "took off to Indiana [where his parents lived] on the run trying to keep from going to jail." (Tr. 70).  Father left Mother and their three children in Tennessee "with the people [they] were staying with." (Tr. 70).  Father's father ["Paternal Grandfather"] told Father that Mother had left the children "with some strangers so [Father] came and snuck back into [Tennessee] and went and got [his] kids and [they] went back to Indiana." (Tr. 70).  Father and Mother subsequently "sign[ed] temporary custody papers giving paternal grandparents [("Paternal Grandparents")] temporary custody" of the three children.  (Tr. 70).

[4]  Father was eventually apprehended for the Tennessee burglary and convicted of the offense in January 2010.  Six months later, in June 2010, Mother gave birth to the Parents' daughter C.S., who is the subject of the termination proceedings in this case.  After Father served six months in jail in Tennessee for the burglary conviction, Mother and Father apparently lived together with C.S. until they separated in August 2014.  Three months later, in November 2014, Father was apparently incarcerated in Tennessee for a probation violation.

[5]  Mother remarried at some point in 2015, and she and her second husband lived with C.S. in Indiana.  In August 2015, Mother left C.S. with various

---

[2] At the time of C.S.'s termination hearing, Mother was unsure of these children's ages.  She explained that she "g[o]t [the three children] all mixed up because they were all born in September." (Tr. 34).

acquaintances while she cared for a sick sister in Ohio. After Mother had been gone for two weeks, and while staying with one of Mother's acquaintances, C.S. "was supposed to be going to bed [but] she got out of the house." (Tr. 40). Someone saw C.S. outside at ten or eleven o'clock at night and contacted DCS. C.S. was removed from Mother's friend's residence and placed in foster care, and DCS filed a petition alleging that C.S. was a child in need of services ("CHINS").

[6] The August 2015 CHINS petition specifically alleged that C.S. was residing in inadequate living conditions in a home that was cluttered and had bed bugs and cockroaches. The petition further alleged that Mother had admitted to recently taking Percocet, fentanyl, and morphine without valid prescriptions. The petition also alleged that Father had just been released from prison after serving time for a probation violation.

[7] The same day the petition was filed, Mother and Father appeared at an initial hearing and admitted that C.S. was a CHINS. Father further admitted that he had not provided support or care for C.S. and that he had not seen C.S. since October 2014. One week later, the trial court adjudicated C.S. to be a CHINS. The dispositional order provided that C.S. would remain in foster care. Father was ordered to contact DCS weekly, follow all DCS recommendations, maintain stable housing, maintain a stable source of income, and obey the law. Father apparently returned to Tennessee after C.S. was adjudicated to be a CHINS, and he was incarcerated in October 2015 after he was convicted of auto theft and found to have violated his probation.

[8] In January 2017, DCS filed a petition to terminate Parents' parental rights. Testimony at the August 2017 and February 2018 termination hearing revealed that Father had remained incarcerated during the pendency of the CHINS proceedings. When asked whether he had participated in any parental programming in prison "to increase [his] ability to parent," Father responded that although "they [were] good about it if you [were] willing to do it," he had not participated in any such programs. (Tr. 73). Instead, Father had completed a carpentry program and expected to be released from prison in May or June 2018. Father further testified that he had not seen C.S. since October 2015. He also testified that his mother ("Paternal Grandmother") had talked to DCS about C.S. going to live with Paternal Grandparents and her three siblings, but Paternal Grandmother had "lost her cell phone or something and she didn't have the number for the lady to contact her anymore." (Tr. 72).

[9] DCS Family Case Manager Michelle Cook ("Case Manager Cook") clarified that she had "made a couple attempts to reach out to [Paternal Grandparents], um, they did not provide [her] with the completed documentation for the [Child Protective Services check] as well as the criminal back ground check." (Tr. 121). Case Manager Cook further explained that when she spoke to Paternal Grandmother again in September 2017, "she informed me . . . [i]t was not a good time [to take C.S.]." (Tr. 121). Case Manager Cook further testified that she recommended the termination of both parents' parental rights so that C.S. would "be able to have a permanent home that . . . every child deserves." (Tr. 105). According to Case Manager Cook, C.S. had "been out of the home for

the last thirty months and um, the pre-adoption home which she [was] in [was] able to meet her needs as a child." (Tr. 105). Case Manager Cook explained that she had made monthly visits to the pre-adoptive foster family home and had no concerns about the foster parents adopting C.S.

[10] Following the hearing, in March 2018, the trial court issued a detailed twelve-page order terminating Father's parental relationship with C.S. Father appeals.

## Decision

[11] Father argues that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[12] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining

whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[13] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[14] Here, Father argues that there is insufficient evidence to support the termination of his parental rights. Specifically, he first contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in C.S.'s removal or the reasons for placement

outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to C.S.'s well-being.

[15] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in C.S.'s removal or the reasons for her placement outside the home will not be remedied.

[16] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be

remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[17] Here, our review of the evidence reveals that C.S. was removed from Mother's home in August 2015 because of Mother's neglect and drug use. She was not placed with Father because he had been incarcerated in Tennessee. Father appeared at the initial CHINS hearing but was incarcerated again in October 2015 after he committed another crime and violated probation. Although Father readily admitted at the termination hearing that the Tennessee prison where he was incarcerated was "good about [parenting programming] if you [were] willing to do it," there is no evidence that Father took advantage of these services to improve his parenting abilities. (Tr. 73). Further, Father has exhibited an habitual pattern of criminal activity as demonstrated by the fact that he has been incarcerated for a majority of C.S.'s life. In addition, at the time of the hearing, he had not seen C.S. for thirty months, and there is no evidence that he made any attempts to contact her or obtain information about her during that time. Lastly, we note that Father admitted at the CHINS initial hearing that he had not provided support or care for C.S, and there is no evidence that he made any effort to do so while he was incarcerated. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in C.S.'s placement outside the home would not be remedied. We find no error.

[18]     Father also argues that there is insufficient evidence that the termination was in C.S.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[19]     Here, our review of the evidence reveals that at the time of the termination hearing, C.S. had been out of the home for thirty months. Case Manager Cook testified that she recommended the termination of Father's parental rights so that C.S. would be able to have a permanent home that every child deserves. According to Case Manager Cook, the preadoptive home in which C.S. had been placed was able to meet C.S.'s needs. This evidence supports the trial court's conclusion that termination was in C.S.'s best interests.

[20]     We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[21]     Affirmed.

Najam, J., and Crone, J., concur.